# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

SKYLER CORNWELL,

                         Plaintiff,

      v.

ANDREW SAUL, Commissioner
of Social Security[1],

                         Defendant.

OPINION AND ORDER

17-cv-647-wmc

---

Plaintiff Skyler Cornwell seeks judicial review of a final decision of the Acting Commissioner of Social Security finding him able to work within the meaning of the Social Security Act. Primarily, plaintiff contends his case should be remanded because the administrative law judge failed to consider his mental and physical limitations properly in arriving at his residual functional capacity. Finding plaintiff's arguments unpersuasive, the court will affirm the commissioner's decision.

## FACTS[2]

### A. Background and Procedural History

Skyler Cornwell was born on June 2, 1995, and underwent interferon and ribavirin treatments for hepatitis as a 14 and 15 year old. The side effects of nausea, fatigue and

---

[1] As now reflected in the caption above, Andrew Saul has succeeded Nancy Berryhill as the Commissioner of the Social Security Administration and has become the named defendant in this case. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name.").

[2] The following facts are drawn from the administrative record ("AR"). (Dkt. # 10.)

joint pain from these treatments prevented Cornwell from attending school on a regular basis. As a result, in September 2009, he was awarded childhood supplemental security income after being found disabled from Hepatitis C and an affective disorder. However, the Hepatitis C virus has remained in remission since plaintiff completed treatment, and Cornwell was eventually able to return to school and graduate from high school in 2014, a year behind schedule.

In May 2013, Cornwell applied for child's insurance benefits ("CBD") under section 202 of the Social Security Act to establish that he was disabled before he turned 22. As required under the Act and its regulations, the Social Security Administration ("SSA") also reconsidered Cornwell's entitlement to benefits under the rules for determining disability for adults when he turned 18 in June 2013. After consolidating his CBD application with his age 18 redetermination, the SSA ruled against Cornwell as to both, finding that he was no longer disabled as of August 1, 2013.

Cornwell then appealed those rulings and requested a hearing before an administrative law judge, which was held in July 2016. Represented by an attorney, Cornwell appeared and testified, as did his mother and a vocational expert. In August 2016, the ALJ issued a decision finding that (1) Cornwell's disability had ended on August 1, 2013, and (2) he had not become disabled again after that date. Cornwell was 21 years old on the date of the ALJ's decision. That decision became the final decision of the Commissioner after the Appeals Council denied review of Cornwell's claim.

## B. Hearing Evidence

### 1. Medical Treatment

After his hepatitis went into remission in 2011, Cornwell continued to struggle with pain, nausea and vomiting, and fatigue.  In December 2012, his pediatrician referred him to a geneticist out of concern that he might have Marfan's Syndrome, a genetic connective tissue disorder.  (AR 379.)  Genetic testing ruled out Marfan's, but the geneticist diagnosed him with MASS phenotype, for which he was advised to have a cardiac evaluation every five years.[3]  (AR 353-54.)  A cardiac evaluation further showed an abnormal EKG with right ventricle dysfunction and bundle branch, but the cardiologist found that Cornwell needed no medical intervention or treatment, nor was he required to limit his activities. (AR 523.)

In January 2013, Cornwell was also diagnosed with mild attention deficit hyperactivity disorder of the inattentive type, for which he was prescribed Concerta.  (AR 369, 372.)  Around that same time, plaintiff was found to be fructose-intolerant.  In July 2013, Cornwell further told his cardiologist that he had a marked improvement in his nausea and other stomach concerns since adjusting his diet to avoid fructose.  (AR 522.) His muscle and joint aches and pains had also improved dramatically since being started on nortriptyline.  (AR 522.)

_____

[3] In the acronym, the "M" stands for myopia and/or mitral valve prolapse; the "A" stands for aortic root dilation that is usually mild and nonprogressive; one "S" stands for skeletal features (such as a tall, thin build and elongated fingers); and the other "S" stands for skin where striae are the most frequent finding.  Plaintiff was found to have long hands and fingers, stretch marks on his skin, and mild nearsightedness (myopia).  (AR 353, 381.)

In November 2013, Cornwell next told his gastroenterologist, Dr. Daryl Fish, that he had been doing quite well, had been active in school and had not missed any days until "just this past week," when he came down with a stomach bug. Otherwise, Cornwell reported that he did not have nausea, indigestion or abdominal pain, and he vomited only rarely. He also reported that he had not felt depressed, was doing well in school and had aspirations for the future. ( AR 530.)

Cornwell also saw his family physician, James Delgadillo, D.O., for a complete physical on November 19, 2013. He reported getting mostly As in his classes, but he was finding it difficult to concentrate in the afternoon. He was also having difficulty sleeping more than five hours a night. Otherwise, Cornwell said that his mood was stable on medications (fluoxetine and nortriptyline) prescribed by his psychiatrist, and he was generally feeling well. Dr. Delgadillo increased Cornwell's dosage of Concerta and prescribed chlortrimeton to help with his insomnia. (AR 539-43.)

A week later, on November 26, 2013, Cornwell saw his psychiatrist, Dr. Linda Kollross. During that session, he specifically denied feeling sad, down, depressed, or hopeless; said he was sleeping fairly well; and reported that his pain was controlled with the nortriptyline. Cornwell also reported that he was able to think and concentrate with the Concerta, was getting good grades, and had missed only five days of school. Further, Dr. Kollross did not note any abnormal findings on his mental status examination and continued his prescriptions, telling Cornwell to follow up in four months. (AR 547-48.) At the four-month follow up visit in April 2014, plaintiff's condition was unchanged. (AR 594-95.)

On June 17, 2014, Cornwell again saw Dr. Fish for a routine check up.  (AR 601.) He reported still having some degree of nausea a few days a week, despite continuing to avoid fructose, not having much of an appetite.  Cornwell also told Dr. Fish that he had little energy, was often fatigued, and his right leg hurt when he walked.  He also said his ADHD and depression were adequately managed with medication, although Dr. Fish noticed he had a depressed affect.  Cornwell also reported his recent graduation from high school and that he was looking for a job.  Mentioning his upcoming disability hearing, Cornwell further expressed his concerns about how a denial of benefits would affect his family's finances.  Because Cornwell's Hepatitis C remained in remission, Dr. Fish opined that plaintiff's various complaints (fatigue, malaise, difficulty walking, nausea and lack of appetite) were all likely related to depression, not his physical condition.  (AR 601-09.)

On July 30, 2014, Cornwell began seeing Jessica Johnson, a psychotherapist, for depression approximately every 2 weeks.  (AR 613.)  At that time, he acknowledged being depressed for two years, reporting that he had increased tiredness, insomnia or hypersomnia, decreased motivation, difficulty getting out of bed, difficulty completing tasks and passive suicidal ideology without intention or plans.  On his mental status examination, Johnson noted that Cornwell was dressed appropriately, provided good eye contact, had normal speech and thought content, and his memory, attention and concentration were all intact.  (AR 615.)  Cornwell did not express any specific recovery goals or goals for therapy, but was receptive to counseling and wanted to pursue higher education in the future.  (*Id*.)

Accompanied by his mother, Cornwell again saw Johnson on September 10, 2014. (AR 632.) His mother reported that Cornwell was increasingly withdrawn and irritable, as well as sleeping more, and appeared to be depressed and experiencing pain related to health issues. More specifically, she reported that Cornwell picked at his skin on his upper arms, shoulders, and back due to self-reported anxiety and stress. Cornwell agreed with his mother's assessment and said his depressive symptoms were interfering with significant areas of his life. He also reported sharing low income housing with his mother that required him to be employed or in school, and that his disability benefits were under review and may be discontinued.

Two weeks later, Cornwell told psychotherapist Johnson that he still had depressive symptoms, but they were less frequent and on average once a week. (AR 634.) He also believed stress related to finances and other worries contributed to his symptoms. Even so, Cornwell reported socializing on a weekly basis with friends in the community and maintaining contact with friends online, and he was hoping to go to school for video game development or teaching.

Just six days later, on September 30, 2014, Cornwell saw his psychiatrist, Dr. Kollross. (AR 636-37.) He reported sleeping well on the nortriptyline and his mood was good on the fluoxetine, but found that the Concerta seemed to be wearing off earlier in the day. Dr. Kollross's notes do not indicate that Cornwell reported any of the depressive symptoms about which he complained to Johnson, and her mental status examination did not note any abnormal findings. Dr. Kollross increased his Concerta dosage, while renewing his other medications. (AR 638.)

Cornwell saw Johnson again nine days later, reporting that his symptoms were unchanged. (AR 639.) He also expressed his hope to continue receiving disability benefits so that he could stabilize his mental and physical health and then pursue employment and education in his future. He continued to engage in activities he enjoyed as he was able, including both solitary activities and online contacts with friends, coping with his low moods primarily by listening to music, playing video games, and talking with his mom or friends, although he also reported often sleeping during the day to pass the time.

At his next visit with Johnson on October 27, 2014, Cornwell said his depressive symptoms had been manageable, and his concentration and focus had been better. He was also sleeping a lot at irregular times, due in part to boredom. (AR 648.) At that time, Cornwell was also planning to apply for a job in January 2015, at which point he would know if his disability benefits had been terminated. (AR 648.)

Although missing his next two appointments with Johnson, when he returned to see her in January 2015, Cornwell said he was "doing good" with his depression, although he had lower mood and energy due to the cold weather. (AR 653.) Cornwell also reported that he socialized with friends every other weekend, watched TV, read, wrote, played video games, and chatted online. He further reported that his daytime napping had decreased, although he still had trouble with sleep on occasion. In addition, Cornwell said he was tired on that date and asked for a shorter session. Two weeks later, Cornwell reported his depressive symptoms had decreased and were manageable. He said he had trouble concentrating on occasion, but it did not interfere with significant areas in his life. Cornwell had also applied for a job at Family Video. (AR 655.)

On March 9, 2015, Cornwell reported to Johnson that he had not heard back from Family Video and was unsure if he was going to continue seeking employment. (AR 657.) At that point, Cornwell described his activities as primarily playing video games, drawing, writing, socializing with his mother and with friends online, and occasionally seeing friends in the community. His mother was concerned about the amount of time plaintiff spent on his computer or in bed. Plaintiff said "boredom, block in creativity and focus, and mind wandering interferes with his desire to engage in activities," with lack of finances also playing a role. (AR 657.) About a month later, he again reported his symptoms were "good," although he was having more physical pain. (AR 659.)

In May 2015, Cornwell was screened for an endocrine disorder and found to have hyperparathyroidism.[4] (AR 668.) Dr. Kazelka, his primary care physician, started plaintiff on a Vitamin D supplement. On July 6, 2015, Cornwell once again told Johnson his depressive symptoms were stable, although he still was tired and unmotivated during the day. (AR 673.) He was also making efforts to decrease his daytime napping and acknowledged that he often forgot to take his medications. Nevertheless, Cornwell continued to engage in activities he enjoyed, socialized online and with friends in the community, and was planning a sleepover with friends. However, Cornwell was still home

_____

[4]Hyperparathyroidism is an excess of parathyroid hormone in the bloodstream due to overactive parathyroid glands, which can cause the body to secrete too much calcium. Its symptoms include osteoporosis, excessive urination, abdominal pain, becoming easily fatigued, depression, forgetfulness, bone and joint pain, frequent complaints of illness and nausea, vomiting, or loss of appetite. It can be caused by a problem with the parathyroid glands themselves, or by another condition, such as severe calcium or vitamin D deficiency, that causes the glands to overwork to compensate for the loss of calcium. https://www.mayoclinic.org/diseases-conditions/hyperparathyroidism/symptoms-causes/syc-20356194.

most days and interacted mostly with his mother, who was also his primary means of transportation. (AR 673.) Plaintiff was considering working or pursuing post-secondary education.

On August 4, 2015, Cornwell had a consultative visit with Dr. Ray, an endocrinologist, for his hyperparathyroidism. (AR 675.) Cornwell said he "had a hard time taking medicines" and had not been taking any of them for the past couple of months. (AR 676.) His mother also told Dr. Ray that Cornwell mostly sat inside and played video games, leading Dr. Ray to conclude that plaintiff's hyperparathyroidism was related to a lack of vitamin D. Dr. Ray stated that he would be unable to help Cornwell unless he took his vitamin D as prescribed. (AR 677.)

On October 30, 2015, Cornwell saw psychotherapist Johnson for the first time in nearly five months. (AR 678.) Cornwell said he had been either too sick or too tired to make or keep previous appointments. Since August, he had also been working the outdoor gate at Menards about 30 hours every 2 weeks. Cornwell was happy with the pay and discussed the benefits of working. He said his mood had been pretty good, but he still had some depressive low days.

Cornwell did not see Johnson again until February 16, 2016. (AR 679.) He was still working at Menards and was planning on increasing to full time in March. He discussed both his position and the benefits of working, as well as his hope to live independently from his mother in the future. Overall, plaintiff said, his sleep, nutritional intake, and mood were all good. (AR 679.)

Cornwell also returned to see Dr. Ray on March 10, 2016. Still not taking vitamin D, Ray wrote that (1) he was not sure why Cornwell was noncompliant and (2) his failure to take the vitamin D was making it difficult to understand why his parathyroid hormone was so high. (AR 681.) Dr. Ray again told Cornwell to take vitamin D as prescribed.

Cornwell saw Johnson again on March 22, 2016. (AR 683.) He told Johnson that pain and fatigue were making it hard to complete his 8-9 hour shifts at work, although his mental health symptoms had been manageable overall. Cornwell was also worried about his upcoming disability hearing, but otherwise did not have much to say and ended the session after 30 minutes.

On April 8, 2016, Cornwell had a psychiatric consult with nurse practitioner Christa Pierce. (AR 685.) Cornwell explained that he had previously seen Dr. Kollross for his depression and ADHD, but he now had a full time job, which made it difficult for follow-up appointments. Cornwell said he was having chronic pain and increased depression that was making it hard to work and fall asleep at night. Pierce noted that Cornwell's mood was depressed, but otherwise his mental status evaluation was normal, with no evidence of suicidal thoughts. Pierce then renewed plaintiff's medications and added another medication that Cornwell could take as needed to help with sleep or high anxiety.

Cornwell saw Johnson again on April 22, 2016. (AR 689.) He described an incident at work on April 2, when he was experiencing a lot of pain and depression and had thoughts about killing himself by walking into a nearby lake or exposing himself to hypothermia. After quitting his job on April 16, Cornwell reported feeling better, with no further suicidal

thoughts, but said he was under a lot of stress because of his upcoming social security hearing.

Cornwell saw Johnson once again on May 25, 2016, during which both he and his mother expressed concerned about his upcoming disability hearing. (AR 691.) Cornwell reported low energy, feeling scatterbrained, trouble concentrating, and chronic pain, but said his mood on most days was "pretty good." On bad days, he would lie down, take medication, and not do much, but on good days he went for walks, had friends over and played video games. His mother also reported that Cornwell was unable to function when he was not doing well.

Cornwell saw Johnson once more before the July 2016 disability hearing before the ALJ. Lying on the couch during this visit on June 8, 2016, Cornwell said that stress and physical pain makes his depression worse and that he did not think he could work full time, if at all. In addition, Cornwell's mother asked Johnson if she would write a letter stating whether plaintiff had the mental capacity to perform full time work on a sustained basis and, if not, why. Johnson noted that she was 'unable to provide letter requested by the patient's mother, and [the] reasoning [was] discussed." (AR 693.)

### 2. Medical Opinions by Agency Physicians

#### a. Kenneth Clark, Ph. D.

Kenneth Clark, Ph. D., a consultant for the state disability agency, reviewed plaintiff Skyler Cornwell's file on May 8, 2014, including notes from his psychiatrist, Dr. Kollross, and forms submitted by two of his high school teachers. (AR 571-583.) Clark determined that plaintiff had the impairments of ADHD, inattentive type, and major depressive

disorder, single episode, but that these were under control. From his review of the records, Dr. Clark determined that plaintiff had only mild restrictions of activities of daily living, mild difficulties maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. Accordingly, he determined that plaintiff's mental impairments were not severe.

### b. **Dr. Pat Chan**

Dr. Chan, a state agency physician, reviewed plaintiff's medical record on May 6, 2014. Based on his review, Chan concluded that plaintiff was able to perform sedentary work, but could not use ladders, ropes or scaffolds and could only occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl. (AR 562-67.)

### 3. **Third Party Written Submissions**

Two of plaintiff's teachers also submitted written responses to questionnaires in connection with plaintiff Cornwell's application. One teacher, who had known plaintiff since September of 2013, indicated that he had a "slight problem" paying attention, staying on task, and working at a reasonable pace, explaining that plaintiff "runs into problems when he is falling asleep/rests due to illness or medication." (AR 233.) The teacher noted that although his attendance had improved, plaintiff missed school more than his peers. (AR 237.) Plaintiff's social studies teacher indicated that he had no problems attending or completing tasks, interacting and relating with others, or acquiring and using information. (AR 239-47.) Although noting plaintiff had been absent frequently in the past, that

teacher also noted that his attendance had improved significantly during the 2013-14 school year. Finally, the teacher noted no problems with plaintiff napping or failing to pay attention during school.

In addition, Tracy Lewis, a school social worker, provided an employment evaluation for plaintiff. (AR 247-48.) Specifically, Lewis had supervised plaintiff performing volunteer work three hours a week at a food bank from February to May, 2014. She wrote that although plaintiff periodically needed breaks due to pain, his quality of work was good; he was respectful, insightful, and intelligent; he complied with directions; and he was self-motivated and worked well independently. Lewis completed another form in June 2014, writing that she had worked closely with plaintiff at school for the past two years. (AR 249-51.) According to Lewis, plaintiff's attendance had improved but he continued to struggle with fatigue and pain, which sometimes made it difficult for him to pay attention. Lewis estimated that plaintiff had trouble paying attention and concentrating about $^1\!/_2$ to $^2\!/_3$ of the time. Finally, Lewis wrote that plaintiff was very intelligent and his social skills had improved, but he sometimes lacked motivation and enthusiasm to do more than the bare minimum.

### 4. **Live Testimony**

At the administrative hearing itself, plaintiff Cornwell testified that he is unable to work full time because he cannot attend on a regular basis. Plaintiff said that during his last year of high school, he missed about 5 days a month because he was in too much pain, too tired to get out of bed, sick to his stomach, or having too much trouble concentrating

to remain at school. (AR 37.) Plaintiff also testified that he has trouble sleeping at night and takes a 2-5 hour nap every other day due to extreme fatigue or pain.

Plaintiff specifically testified about his job as a sales attendant at Menards in 2015-2016. His duties were to sit in the guard shack in the outside yard and, when customers entered the yard to pick up items they had purchased, get out and walk to the vehicle to scan their orders and check to make sure they left with the correct items. Plaintiff said he could manage doing that for 15 hours a week, but he was too tired and in too much pain to work full time. (AR 1270-71.) Plaintiff also said his employer was happy with his work and had invited him to return once his health improved. (AR 1272.) Plaintiff further testified that on the particular day in April 2016 when he had thought about suicide, he had been sick and vomiting but had to work nearly his entire shift because there was no one available to cover for him. (AR 1272.) Plaintiff quit the job two weeks later. At the time of the administrative hearing, plaintiff was still living with his mother and was unemployed. He denied having any further suicidal thoughts, but was not sure if he was depressed or not.

Plaintiff's mother testified that she did not think plaintiff could work five days a week because of his attention problems and depression. She did not think the medications plaintiff took for his depression were working. She further testified that plaintiff spent a lot of time in bed and complained often that he was in pain. (AR 1286.)

## C. Administrative Law Judge's Decision

Applying the Commissioner's five-step procedure for evaluating disability claims, *see* 20 C.F.R. § 416.920(a), the ALJ found that plaintiff had not engaged in substantial gainful

activity after his alleged onset date (step 1); he had the severe impairments of a gastrointestinal disorder and hyperparathyroidism (step 2); none of plaintiff's impairments singly or in combination met the criteria of a listed impairment (step 3); he had no past relevant work (step 4); and there were jobs existing in significant numbers in the national economy that he could perform, namely packer, order clerk, and receptionist (step 5).

As a predicate to his findings at step 4 and 5, the ALJ assessed plaintiff's residual functional capacity (RFC), finding that he was able to perform sedentary work, with the following restrictions:

- he could never climb ladders, ropers or scaffolds;

- he could occasionally climb ramps or stairs;

- he could never work around machinery or hazardous heights;

- he could never perform fast-pace or piece work; and

- he would be off task up to 10% of the work day in addition to ordinary breaks from work.

In reaching these conclusions, the ALJ reviewed and discussed all of the hearing evidence summarized above in this opinion. In particular, the ALJ addressed plaintiff's testimony, as corroborated by his mother's, that plaintiff was unable to sustain any type of full-time activity because of pain, fatigue, depression, anxiety, concentration problems, and suicidal thoughts. Although plaintiff's medically determinable impairments could reasonably be expected to cause the complained-of symptoms, the ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not consistent with the evidence in the record. Those inconsistencies included:

- numerous office visits during which plaintiff either did not complain of pain, fatigue, nausea, problems concentrating, anxiety or depression, or during which he reported that his symptoms were well-controlled on medication;

- the lack of any findings during musculoskeletal or physical examinations that would support plaintiff's allegations of disabling pain, fatigue, and nausea;

- the lack of any abnormal findings during mental status evaluations;

- evidence showing that plaintiff does not always take his medications as prescribed;

- the absence of any opinions from treating or examining sources indicating that plaintiff is disabled or even has any work-related limitations;

- the reports from plaintiff's teachers, which did not note excessive absences or napping by plaintiff during the day, and noted only slight attention problems; and

- plaintiff's failure to pursue employment other than the one failed work attempt at Menard's, or to seek services from the Department of Vocational Rehabilitation to find proper employment within his work capacity.

In crafting his RFC, the ALJ also indicated that he was giving "great weight" to the opinion of the state agency psychological consultant, Kenneth Clark, Ph.D., that plaintiff's mental illness was nonsevere and caused no more than mild limitations. The ALJ also credited Dr. Chan's conclusion that plaintiff could sustain sedentary work with postural limitations, but did not include Dr. Chan's limitations on stooping, kneeling, crouching and crawling because plaintiff himself had not claimed to have such limitations. With respect to the off-task limitation, the ALJ explained that he had given "some weight" to the statements of plaintiff's teachers, who noted that plaintiff had at most "slight" problems with maintaining concentration and work pace. Such a "slight" rating, found the ALJ, supported a conclusion that plaintiff would not be off task more than 10% of the workday

(the threshold for unskilled, competitive employment) in addition to regular breaks.  (AR 59.)

Relying on the testimony of a vocational expert, the ALJ then found that an individual of plaintiff's age, education, work experience, and residual functional capacity would be able to perform the jobs of packer, order clerk, and receptionist, and further that such jobs existed in significant numbers in the state and national economies.  Accordingly, the ALJ found plaintiff not disabled as of August 1, 2013, when his childhood disability ended.[5]

## OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well settled.  Findings of fact are "conclusive," so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner.  *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

---

[5] Additional details in the ALJ's decision are also discussed as necessary in the analysis below.

At the same time, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision. *Edwards*, 985 F.2d at 336. If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th 2006). To build this bridge, "the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544.

Here, plaintiff challenges the ALJ's opinion on numerous grounds in an unhelpful, scattershot approach, but the bulk of his criticisms are directed at the RFC assessment.[6] Principally, plaintiff argues that the ALJ committed the following errors in formulating plaintiff's RFC: (a) failed to account for plaintiff's mental health treatment records undermining the state agency consultant's conclusion that his mental impairment was not severe; (b) failed to evaluate properly plaintiff's credibility in general and his complaints of pain and fatigue in particular; (c) failed to build an adequate bridge between the evidence and his conclusion that plaintiff would be off task for no more than 10% of the workday;

---

[6] Plaintiff's counsel did not use point headings in his brief to identify his arguments, but rather wove them throughout his discussion of the various pieces of evidence. This places an unfair burden on opposing counsel and the court, who are not required to hunt and mine plaintiff's principal arguments hidden in the text of his brief. In future social security cases, counsel is advised to use point headings to identify at least his major criticisms of the ALJ's decision and arguments for reversal or remand.

and (d) gave undue weight to a state agency consultant's medical opinion concerning his physical limitations. Because the court finds all of these criticisms unpersuasive for the reasons explained below, it will affirm the Commissioner's decision.

### A. Dr. Clark's Opinion

As noted previously, although finding plaintiff suffered from medically-determinable mental impairments, the ALJ gave great weight to Dr. Clark's opinion that those impairments caused no more than mild limitations and, therefore, were not severe. Plaintiff contends this was error because Dr. Clark did not review the two years of office visit notes with his psychotherapist, Jessica Johnson.

"An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018); *see also Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). In *Moreno*, for example, the Court of Appeals remanded the case to the Agency for a new mental health assessment where the ALJ relied on a 2007 state-agency opinion that the court determined was "stale" in light of a treating psychologist's office notes from 2010-2012 that documented "significant and new developments" in plaintiff's mental health. 882 F.3d at 728-29. In *Stage*, the later-obtained evidence consisted of a report from an orthopedic surgeon who concluded that Stage had spinal degeneration and would need a total left hip replacement, which reasonably called into doubt the state-agency reviewing physician's opinion that Stage

could stand and walk for six hours a day. 812 F.3d at 1123, 1126. Finally, in *Goins*, the state-agency physicians had not seen the results of an MRI, which showed a worsening of Goins' spinal problems, and undermined the reasoning of one of the physicians who discounted Goins' allegation that her condition had worsened, an opinion on which the ALJ had relied. 764 F.3d at 680.

Here, plaintiff argues that the counseling notes establish that his depressive symptoms -- namely, fatigue, decreased motivation, and lack of concentration -- increased in severity after Dr. Clark reviewed his file and supported more severe limitations than either Dr. Clark or the ALJ found, making remand necessary to account for Johnson's records. Defendant disagrees, arguing that the new records, which the ALJ discussed in detail, were not reasonably likely to have changed Dr. Clark's opinion.

On this record, the court finds that remand is unnecessary for consideration of Johnson's counseling records. First, as defendant notes, Johnson's records consisted mainly of plaintiff's subjective complaints. Second, unlike in *Moreno*, *Stage*, and *Goins*, the new records here do not contain medical evidence of any "new and significant" mental health diagnoses of which Dr. Clark was not aware. To the contrary, during the time period when plaintiff saw Johnson, he was diagnosed with *no* additional mental impairments nor prescribed any new medications. Third, Cornwell repeatedly told his psychiatrist and other doctors that he was doing well and that, overall, his pain, fatigue and concentration were being managed adequately on his current medications. As the ALJ noted, these statements by plaintiff to his doctors contrast with and diminish the credibility of his more serious subjective complaints to Johnson, most of which came shortly before his disability hearing.

Fourth, and arguably most importantly, Johnson refused to provide an opinion that plaintiff's mental impairments were too severe to perform full time work on a sustained basis, meaning that she would not undermine Dr. Clark's opinion even after two years of seeing Cornwell.

Further, as the ALJ noted, plaintiff's mental status evaluations here remained largely normal, and plaintiff has proved no impaired mental functioning. Indeed, even when plaintiff began having difficulties working full time, he told Johnson his mental health was manageable. Rather, it was reportedly his pain that made it difficult to work. This is also consistent with plaintiff's testimony at the hearing, where he explained that pain and fatigue caused him to quit his job.

Finally, as the ALJ discussed, even the incident in April 2016, when plaintiff reported to Johnson that he became so depressed at work that he thought about suicide, is not enough to require remand. As the ALJ noted, Johnson apparently did not find the episode that significant, insofar as she did not recommend any emergency or urgent follow-up treatment upon hearing plaintiff's report. Moreover, as noted, she declined only a few weeks later to submit a letter regarding plaintiff's work-related mental condition; in fact, *none* of plaintiff's treating physicians submitted a statement finding plaintiff to have a disabling mental condition or even any work-related mental limitations. Although it is true, as plaintiff points out, that it is not entirely clear from Johnson's note *why* she declined to submit a letter on plaintiff's behalf, it was reasonable for the ALJ to infer that Johnson did not believe an opinion favorable to plaintiff was warranted. *Accord Scott v. Sullivan*, 898 F. 2d 519, 523 (7th Cir. 1990) (doctor's refusal to provide opinion created negative

inference that doctor did not believe an opinion favorable to claimant was warranted); *see also Sienkiewicz v. Barnhart*, 409 F.3d 798, 803 (7th Cir. 2005) ("But as the ALJ observed, both of the consulting physicians who reviewed Sienkiewicz's records opined that she could meet the requirements of light work by sitting for six hours in an eight-hour day, and no doctor ever suggested that any greater limitation was required.").

In sum, Dr. Clark was not reasonably likely to have changed his opinion had he reviewed the counseling records from plaintiff's psychotherapist Johnson. Specifically, those records did not document any new and serious mental impairments or undermine Dr. Clark's conclusion that plaintiff's mental impairments imposed no more than mild functional limitations. Moreover, as the ALJ noted, many of plaintiff's statements to Johnson concerning his subjective symptoms could not be fully credited given the existence of other substantial, contradictory evidence in the record.

## B. Credibility

Plaintiff raises both general and specific objections to the ALJ's credibility determination. As an initial matter, plaintiff argues that the ALJ relied on disfavored "boilerplate" and did not explain in his decision "which of plaintiff's statements about symptoms and their limiting effects were given weight, which were not, and why." (Pl.'s Br. (dkt. # 17) 3) However, the ALJ "need not specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). Moreover, the inclusion of "meaningless boilerplate" does not automatically undermine the credibility finding as long as the ALJ gave good reasons supported by the evidence for discrediting the claimant's

allegations. *See, e.g., Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Hammerslough v. Berryhill*, No. 18-1732, 2019 WL 141207, at *3 (7th Cir. Jan. 9, 2019) (nonprecedential disposition) ("The phrase 'not entirely credible' is meaningless boilerplate only when the ALJ substitutes it for a proper, full-bodied explanation of why credibility is lacking.").

Here, unlike the cases relied upon by plaintiff, the ALJ provided a good explanation for his credibility determination. With respect to plaintiff's pain: the ALJ cited several office notes in which he stated that his pain had improved and was adequately managed on nortriptyline; no treatment provider had suggested the need for serious interventions such as narcotic pain medication, injections or other treatment; and musculoskeletal and other physical examinations had not identified abnormalities that would support his allegations or preclude sedentary activities. With respect to plaintiff's alleged fatigue and need to nap for hours during the day, the ALJ pointed to various office visits during which plaintiff did not mention naps, and further noted that plaintiff told his doctors that the medications prescribed for his insomnia were helping. While the ALJ acknowledged that plaintiff did report increased sleep in October 2014, he also noted that it was partly attributed to boredom. Overall, the ALJ did not see evidence in the record to indicate that plaintiff's impairments caused fatigue to such a degree that he would have to nap or otherwise take breaks during the workday.

With respect to plaintiff's complaints of nausea and abdominal pain, the ALJ noted several office records in which plaintiff specifically denied significant problems with abdominal pain or vomiting, particularly after adjusting his diet to avoid fructose. As the ALJ noted, plaintiff told his gastroenterologist in December 2014 in particular that he was

"feeling fine" as far as his GI symptoms were concerned, and he told Johnson in February 2016 that his nutritional intake was good, without mentioning any nausea, stomach pain, or vomiting.

With respect to plaintiff's complaints of depression, anxiety, and concentration problems, the ALJ pointed out that he had repeatedly told his doctors that his ADHD was well controlled on Concerta and that the fluoxetine (Prozac) was effective in controlling his depression; no acute problems were detected during mental status evaluations; plaintiff denied problems with depression or anxiety during visits with other providers at around the same time he began counseling; and he initially had told Johnson that his mental health symptoms were manageable even while sustaining full-time work.

In addition to these specific inconsistencies, the ALJ noted two general inconsistencies that suggested plaintiff's subjective symptoms were not as severe as he now claimed. First, citing Dr. Ray's office notes, the ALJ noted that plaintiff had not been entirely compliant in taking his medications. Second, plaintiff had never worked (other than his failed attempt at Menards), and he had never contacted the Department of Vocational Rehabilitation or any other agency to attempt to find jobs within his physical restrictions.

In spite of this thorough discussion, plaintiff argues that the ALJ "cherry picked" and omitted favorable pieces of evidence. (Pl.'s Br. (dkt. # 17) 5-11). Most of plaintiff's criticisms are picayune and unworthy of discussion. Moreover, while an ALJ cannot "cherry-pick," *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010), he also need not discuss every single piece of evidence, *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Here,

the ALJ did not ignore any lines of evidence contrary to plaintiff's assertion. For the most part, plaintiff's arguments amount to a general invitation for this court to reweigh the evidence and substitute its judgment for the ALJ, which, of course, it cannot do. *Id.*

Plaintiff does make three specific credibility challenges that are worth addressing. First, he argues that the ALJ violated SSR 82-59 by considering plaintiff's medication non-compliance as a factor detracting from his credibility. In particular, SSR 82-59 provides that an individual "who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment" that would be expected to restore the individual's ability to work, cannot be found disabled by virtue of that failure. As the commissioner correctly notes, however, SSR 82-59 is irrelevant to the instant case because it applies only when a claimant would otherwise be found disabled but for his medication noncompliance. The ALJ never made such a finding; rather, he noted only that plaintiff's failure to take his medications as prescribed suggested his symptoms were not as severe as he alleged.

Second, plaintiff argues that the ALJ erred in considering plaintiff's medication non-compliance without first inquiring into plaintiff's reasons for doing so. *See Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014) (ALJ must not draw inferences against claimant for lack of treatment without inquiring into factors such as claimant's ability to pay or adverse side effects). While it is true that the ALJ failed to make such an inquiry in this case, even now, plaintiff does not proffer any evidence that he could not afford his medications, that he suffered adverse side effects, or that there were other legitimate reasons for his non-compliance. Nor is there anything in the record he can point to that

suggests any of those scenarios were present. To the contrary, plaintiff told Johnson that he often "forgot" to take his medications; from this, the ALJ could reasonably presume this is also what plaintiff meant when he told Dr. Ray he "had a hard time" taking medications. Nor did plaintiff suggest financial hardship despite being pressed -- twice -- by Dr. Ray about the importance of taking vitamin D for his hyperparathyroidism. Moreover, judging by plaintiff's extensive treatment record, lack of finances was not an issue.

So, even though the ALJ technically erred in failing to ask plaintiff directly to explain his medication non-compliance, there is nothing in the record or put forth by plaintiff to suggest that the ALJ drew the incorrect inference. In any case, remand is not required because plaintiff's medication non-compliance was only one of several otherwise proper factors on which the ALJ relied in assessing plaintiff's credibility. *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (ALJ's failure to consider claimant's explanation for failure to seek surgery not fatal where ALJ's credibility determination was adequate for other reasons).

Third, and finally, plaintiff criticizes the ALJ for relying on plaintiff's limited work history as a reason to discount his subjective complaints. (Pl.'s Br. (dkt. # 17 ) 20.) The Commissioner appears to concede the ALJ erred to the extent he may have found plaintiff not entirely credible for not working during a time period when he had been found disabled, but she also maintains any error was again harmless because the ALJ had many other, legitimate reasons for rejecting plaintiff's complaints. (Def.'s Br. (dkt. # 19) 17.) The court agrees. The ALJ's discussion of plaintiff's lack of work history and failure to work with a vocational agency was only one factor, among many, cited by the ALJ for

finding plaintiff not entirely credible. As discussed in the preceding paragraphs, many of those other reasons are more than adequately supported by the record evidence and not patently wrong. Accordingly, the court must uphold the ALJ's credibility determination. *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (ALJ's credibility finding need not be "flawless" in order to survive scrutiny under "patently wrong" standard.).

### C. Off-Task Limitation

Next, plaintiff argues that the ALJ did not lay a proper foundation for a 10% off-task limitation in his residual functional capacity assessment. *See Lanigan v. Berryhill*, 865 F.3d 558, 566 (7th Cir. 2017) (finding administrative law judge failed to build bridge between 10 percent off-task limitation and record as whole). When making residual functional capacity determinations, SSR 96–8p requires ALJs to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The Seventh Circuit has highlighted the importance of this requirement, holding that an ALJ must explain how he or she reaches a particular conclusion on a claimant's limitations. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("The ALJ needed to explain how she reached her conclusions about Scott's physical capabilities."); *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir. 2010) ("An ALJ must explain why he does not credit evidence [of limitations] that would support strongly a claim of disability, or why he concludes that such evidence is outweighed by other evidence.").

In this case, plaintiff argues that the ALJ's decision does not explain why 10 percent is the appropriate limit (as opposed to 12%, 20%, 50%, etc.). Even so, plaintiff fails to identify medical evidence -- or any other type of evidence, for that matter -- that the ALJ should have considered in choosing this limit, but did not. Instead, plaintiff points to reports from his school social worker and two teachers as supporting a greater off-task limitation, but the ALJ explicitly addressed these records in his decision in the context of the off-task limitation. (AR 58-59.) Specifically, the ALJ noted that Lewis, the school social worker, opined that plaintiff would have difficulty paying attention ½-²/₃ of the time. However, the ALJ expressed understandable skepticism as to the accuracy of this high estimate, noting that Lewis had offered no explanation for it. (AR 59.) The ALJ also contrasted Lewis's report with the reports from plaintiff's two teachers, one of whom observed plaintiff to have no problems in any area except sports, and the other of whom identified only "slight" problems with attention, focus and pace. (*Id.*) Accordingly, the ALJ decided to give some weight to the teachers' observations, finding their conclusion that plaintiff had only "slight" limitations in work pace translated to plaintiff being off task no more than 10% of the workday, in addition to regular breaks. Because the ALJ's decision reflects a reasonable resolution of the conflicting evidence, this court cannot disturb it.

To be sure, the 10% figure is somewhat arbitrary, but plaintiff fails to make a persuasive case that any other number would have been any less arbitrary. In fact, the 10% figure, which is the threshold for competitive employment, is consistent with all of the other evidence in the record cited by the ALJ for his conclusion that plaintiff was capable of full time, sedentary work. As the ALJ noted in particular, *none* of plaintiff's

treating physicians or counselors offered an opinion that plaintiff could not sustain competitive employment, Dr. Clark found he had only mild mental limitations, mental status examinations were largely normal, plaintiff said his attention problems were managed on Concerta, and plaintiff acknowledged that his employer had been satisfied with his work performance. Accordingly, the court is satisfied that, overall, the ALJ's conclusion that plaintiff would not be off-task more than 10% of the time is adequately explained and supported by the record.

### D. Dr. Chan's Opinion

Finally, plaintiff argues the ALJ did not properly evaluate the opinion of Dr. Chan, who reviewed plaintiff's medical record and assessed plaintiff's residual functional capacity on May 6, 2014. Chan concluded that plaintiff was able to perform sedentary work but could not use ladders, ropes or scaffolds and could only occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl. AR 562-67. Plaintiff argues the ALJ erred in giving any weight to this opinion because Dr. Chan did not explain how he reconciled plaintiff's reported limitations, which he found to be "fully credible," with the finding that plaintiff could perform full-time, sedentary work.

This last argument merits little discussion. To support the argument that his statements, if credited, would have established that he could *not* perform such work, plaintiff points to a Disability Report that he completed in July 2014, two months *after* Dr. Chan conducted his review. (Pl.'s Br. (dkt. # 17) 5 (citing AR 316-323).) Obviously, Dr. Chan could not have been referring to that report when he assessed the credibility of

plaintiff's statements, since it did not yet exist. Thus, the record does not support plaintiff's argument that Chan's opinion was internally inconsistent. More importantly, plaintiff cites to no medical opinion or objective evidence in the record that would support more severe restrictions than Dr. Chan actually found.

To the extent that plaintiff is arguing that the ALJ erred in rejecting plaintiff's testimony that his physical limitations prevent him from full time work, the court has already addressed those arguments in upholding the ALJ's credibility finding. Nor did the ALJ err in declining to include the limitations found by Dr. Chan on stooping, kneeling, crouching and crawling. As the ALJ explained, plaintiff said on one of his forms that he *could* do these activities. It cannot be error for an ALJ to refuse to include in his RFC assessment limitations that even the plaintiff denies having.

## ORDER

IT IS ORDERED that the decision of defendant Andrew Saul, Commissioner of Social Security, is AFFIRMED and plaintiff Skyler Cornwell's appeal is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 31st day of January, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge